**REDACTED TRANSCRIPT**

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF

VS.                                    NO. 3:19-CR-65-11

DERRICK HOUSTON                              DEFENDANT


ABORTED SENTENCING HEARING

SEALED PORTIONS REDACTED


BEFORE HONORABLE DEBRA M. BROWN
CHIEF UNITED STATES DISTRICT JUDGE


Oxford, Mississippi
September 29, 2022

APPEARANCES:

For the Government:   SAMUEL R. STRINGFELLOW, ESQUIRE
                      U.S. ATTORNEY'S OFFICE
                      900 Jefferson Avenue
                      Oxford, Mississippi  38655

For the Defendant:    JOSEPH M. HOLLOMON, ESQUIRE
                      JOE M. HOLLOMON & ASSOCIATES, P.A.
                      Post Office Box 22683
                      Jackson, Mississippi 39225-2683

Court Reporter:       BRENDA D. BLACKBURN, RPR, CCR #1087
                      FEDERAL OFFICIAL COURT REPORTER
                      305 Main Street
                      Greenville, Mississippi  38701

**REDACTED TRANSCRIPT**

2

1    (CALL TO ORDER OF COURT AT 11:00 A.M.)

2         **THE COURT:**  Good morning.  Be seated.

3         **MR. HOLLOMON:**  Good morning, Your Honor.

4         **THE COURT:**  Please call our case.

5         **COURTROOM DEPUTY:**  The Court calls United States of

6    America versus Derrick Houston, 3:19-CR-65.

7         **THE COURT:**  We're here for Mr. Houston's sentencing.

8    Who is here as counsel for the government?

9         **MR. STRINGFELLOW:**  Sam Stringfellow for the United

10   States.

11        **THE COURT:**  Who is here as counsel for the defendant?

12        **MR. HOLLOMON:**  Good morning, Your Honor.  Joe

13   Hollomon for Derrick Houston.

14        **THE COURT:**  And our representative from probation?

15        **PROBATION OFFICER:**  Andrew Fountain, Your Honor.

16        **THE COURT:**  You-all may remain at counsel table.

17   Just make sure that there is a microphone in front of you and

18   that the green light is on.

19        Mr.~Houston, you will be sentenced today for the crime of

20   conspiracy to commit racketeering activities, including to

21   distribute controlled substances, and to commit murder.

22        I've reviewed the Presentence Investigation Report and its

23   addendum.  Have you had enough time to review and discuss the

24   Presentence Investigation Report and its addendum with your

25   attorney, including any potential objections?

REDACTED TRANSCRIPT                                              3

1          **THE DEFENDANT:** Yes, I have. I did -- I do have some

2   things that I wanted to put in the PSR. But I haven't been

3   able to put them in there yet, though. So I made it a part of

4   the memorandum.

5          **THE COURT:** All right. Well, I do want to understand

6   what you're speaking about. So let me ask you some more

7   specific questions. To the extent that the Presentence Report

8   has certain facts reported in it, the Court understands that

9   you do not have any objections to the facts reported?

10         **THE DEFENDANT:** Yeah. My children. I have --

11         (COUNSEL AND DEFENDANT CONFERRING.)

12         **THE COURT:** Well, and -- I hear you, unfortunately.

13  And let me just say, if you are going to have a private

14  conversation with your attorney, you-all need to turn the

15  microphones off.

16         **MR. HOLLOMON:** I'm sorry, Your Honor.

17         **THE COURT:** And then you can turn them back on.

18         **MR. HOLLOMON:** Thank you.

19         **THE COURT:** You mentioned something about your

20  children, Mr.~Houston. Does the Presentence Report accurately

21  reflect your children, their ages; their names? Is it

22  something in that respect that you're curious about?

23         **THE DEFENDANT:** No. It say I don't have any

24  children.

25         **THE COURT:** Okay. So the Presentence Report doesn't

REDACTED TRANSCRIPT

4

1 say that you have children.  So, that's okay.

2     **THE DEFENDANT:**  That's correct.

3     **THE COURT:**  Okay.  Let me try to ask a different

4 question, then.  The Presentence Report is comprised of various

5 things.  One of those things is it does report facts about you,

6 not just related to the crime, but about your personal

7 background as well.  So when I read that there were no

8 objections to the Presentence Report in that respect, I took it

9 to mean that what is reported as far as your background is

10 concerned and in association with the crime that you've

11 committed, that you do not dispute any of that.  Is that

12 accurate?

13     **THE DEFENDANT:**  No, I objected, Your Honor.  I filed

14 a letter to my attorney objecting to -- I do have a GED, and I

15 do have children, and you know, some things that I felt that

16 was important that needed to be in there.

17     **THE COURT:**  Okay.  Well, let's -- I definitely want

18 to talk about those things.  If there are certain -- because it

19 does -- I reread it again just a few minutes ago.  It does

20 reflect that you do not have any children.  So, if you have

21 children, we can add those corrections --

22     **THE DEFENDANT:**  Yeah.

23     **THE COURT:**  -- to the Presentence Report.

24   So, does everybody have a copy in front of them?  Do you

25 have a copy, Mr. Hollomon?

**REDACTED TRANSCRIPT**

5

1   **MR. HOLLOMON:** We do, Your Honor.

2   **THE COURT:** Okay. Let's look at -- and I definitely

3   want to go through and look at precisely what needs to be

4   edited in that respect, if it is inaccurate.

5   So, Counsel, can you assist Mr.~Houston to what paragraph

6   of the Presentence Report that we're speaking of?

7   **MR. HOLLOMON:** Yes, Your Honor.

8   **THE COURT:** And if you-all need a minute, just let me

9   know, and we can get off the record and let you-all take care

10  of that.

11  (PAUSE.)

12  **MR. HOLLOMON:** May it please the Court, Your Honor,

13  we're, I believe, talking about paragraph 86 on page 16 of the

14  Presentence Investigation Report.

15  **THE COURT:** All right, I'm there. And it does

16  mention siblings in that paragraph. No, you said, "86." Yes,

17  it starts off, "The defendant has no children."

18  So, Mr.~Houston, you do have children?

19  **THE DEFENDANT:** Yes, ma'am.

20  **THE COURT:** And how many?

21  **THE DEFENDANT:** I have four children.

22  **THE COURT:** Okay. What are their names and ages?

23  **THE DEFENDANT:** Jacquis Houston.

24  **THE COURT:** Okay, you're going to have to spell that

25  for me.

REDACTED TRANSCRIPT

6

1          **THE DEFENDANT:**  J-A-C-Q-U-I-S.  Houston,

2   H-O-U-S-T-O-N.

3          **THE COURT:**  Okay.  And age?

4          **THE DEFENDANT:**  He's 24.

5          **THE COURT:**  All right.  Next.

6          **THE DEFENDANT:**  Chastity Booker.

7          **THE COURT:**  All right. Age?

8          **THE DEFENDANT:**  She's 26.

9          **THE COURT:**  Okay.

10          **THE DEFENDANT:**  Sh'tia Houston.

11          **THE COURT:**  Can you spell that, please?

12          **THE DEFENDANT:**  S-H, apostrophe, T-I-A.

13          **THE COURT:**  Age?

14          **THE DEFENDANT:**  She's 23.

15          **THE COURT:**  All right.

16          **THE DEFENDANT:**  And Camillia Houston.

17          **THE COURT:**  Just to -- spell that, to be on the safe

18   side.

19          **THE DEFENDANT:**  C-A-M-I-L-L-I-A.

20          **THE COURT:**  Age?

21          **THE DEFENDANT:**  She's 20.

22          **THE COURT:**  Okay.  All right.  So we've got that.

23   And we certainly can have -- and I don't believe the government

24   would have any issue with the Presentence Report being amended

25   in that respect.

REDACTED TRANSCRIPT

1  **MR. STRINGFELLOW:**  No, Your Honor.

2  **THE COURT:**  All right.  So, those changes will be

3  made, Mr. Houston.  Anything else?

4  **MR. HOLLOMON:**  Your Honor, my client would also like

5  it to be noted that he has obtained a GED.

6  **THE COURT:**  All right.  And I did notice that as

7  well.  So that pertains to -- what paragraph are we speaking

8  about?  Just to make sure everyone is on the same page.

9  **MR. STRINGFELLOW:**  Your Honor, I believe that's

10  paragraph 92.

11  **THE COURT:**  All right.  And now it reads that

12  you -- no, it does say that he earned his GED.  So, I don't

13  think we need to change anything in that respect.

14  **PROBATION OFFICER:**  Your Honor, may I speak to that?

15  **THE COURT:**  You may.

16  **PROBATION OFFICER:**  I was just awaiting verification

17  on that.  He said he had documentation.  Otherwise, I can't put

18  in there that it's confirmed.

19  **THE COURT:**  Oh, I see.  Because you are speaking

20  about what Mr.~Houston reported to you?

21  **PROBATION OFFICER:**  Yes, ma'am.

22  **THE COURT:**  Okay.  Do you have confirmation that you

23  obtained your GED?

24  **THE DEFENDANT:**  Yes, ma'am.

25  **THE COURT:**  Is there anything in the file that you

REDACTED TRANSCRIPT                                    8

1   have?  Because that's the only thing that the Presentence

2   Report is saying that the probation officer didn't have

3   verification that you had received your GED.

4            **THE DEFENDANT:**  I think we sent it to you as exhibits

5   inside the memorandum.

6            **THE COURT:**  Okay.  Very well.  What exhibit?  And I

7   don't have those right here in front of me.  I did look at

8   them.

9            **THE DEFENDANT:**  It's Exhibit M.

10           **THE COURT:**  Okay.  Well, if that is the case, then, I

11   would ask my probation officer to take a look at that, and if

12   it's satisfied that it's been verified, then we can update the

13   Presentence Report in that respect, too.

14           **PROBATION OFFICER:**  Yes, Your Honor.

15           **THE COURT:**  No objection from the government?

16           **MR. STRINGFELLOW:**  None, Your Honor.

17           **THE DEFENDANT:**  Just the license.

18           **THE COURT:**  All right.  Anything else, Mr. Houston?

19           **MR. HOLLOMON:**  Your Honor, finally, on behalf of my

20   client, he would like it noted that he has also obtained his

21   ministry license, which also was included in the --

22           **THE DEFENDANT:**  Exhibit.

23           **MR. HOLLOMON:**  -- exhibits.

24           **THE COURT:**  Now, that, I think I would just take as

25   part of the Sentencing Memorandum and say that it doesn't

REDACTED TRANSCRIPT

9

1   necessarily have to be in the Presentence Report.  But if it is

2   attached to the Sentencing Memorandum, Mr.~Houston, I have

3   reviewed that and take that into consideration as well.  And

4   you're certainly free to speak about that when it comes time

5   for statements.  Okay?

6   **MR. HOLLOMON:**  Thank you, Your Honor.

7   **THE COURT:**  All right.  Beyond -- well, and let me go

8   back.  Because I had asked if you'd had enough time to review

9   the Presentence Investigation Report and discuss it with your

10   attorney.  So I want you to answer that question as to whether

11   or not you believe you had enough time to do that.

12   **THE DEFENDANT:**  Well, as I said, I had enough -- I

13   reviewed it, and I just had some objections, you know.

14   **THE COURT:**  All right.  But you've had enough

15   sufficient time to review it?

16   **THE DEFENDANT:**  Yes.

17   **THE COURT:**  Very well.

18   Outside of the matters that we just discussed as to the

19   facts, are there any other factual issue that you take with the

20   Presentence Report?

21   **THE DEFENDANT:**  No, that's all.  That's it.  No,

22   ma'am.

23   **THE COURT:**  All right, then.  And you have had the

24   opportunity to discuss any potential objections -- and I don't

25   really -- I see these more so as corrections to the Presentence

REDACTED TRANSCRIPT

1    Report.  I'll accept them as objections, however you go.  But

2    I've already instructed the probation officer, without

3    objection by the government, that we're going to amend the

4    Presentence Report that way.  But have you had enough time to

5    discuss any other potential objections -- potential objections

6    with your counsel?

7            **THE DEFENDANT:**  In with the Presentence Report?

8            **THE COURT:**  Uh-huh.

9            **THE DEFENDANT:**  Yeah.

10           **THE COURT:**  All right.  So, beyond what we have

11   discussed -- what we've just discussed about your children's

12   names and ages and the verification, then, I am going to adopt

13   the Presentence Report in full as the Court's findings of fact

14   as amended with respect to those items that we just spoke

15   about.

16           **THE DEFENDANT:**  Thank you.

17           **THE COURT:**  You have mentioned the Sentencing

18   Memorandum.  I do state, for the record, the other documents

19   that have been submitted on behalf of the defendant -- here,

20   you -- Mr.~Houston.  And what I have is the Sentencing

21   Memorandum, and that is it.  Are there any under documents that

22   were submitted on behalf of the defendant that I have not

23   mentioned here today?

24           **MR. HOLLOMON:**  Your Honor, we also admitted -- or

25   submitted to the Court by mail a group of documents which were

REDACTED TRANSCRIPT

11

1  marked as exhibits that are mentioned in the Sentencing

2  Memorandum.

3       **THE COURT:**  You sent by mail?

4       **MR. HOLLOMON:**  Yes, Your Honor.

5       **THE COURT:**  Okay.  Well, I don't have that mail.  And

6  in fact, we just looked at the Sentencing Memorandum.  There

7  are no exhibits attached to it.

8       **MR. HOLLOMON:**  No, this was separate, Your Honor.

9       **THE COURT:**  Okay.  You sent the exhibits to the

10 Sentencing Memorandum separately?

11      **MR. HOLLOMON:**  Yes, Your Honor.

12      **THE COURT:**  By mail?

13      **MR. HOLLOMON:**  Yes, Your Honor.

14      **THE COURT:**  Why weren't they filed on the docket in

15 this case?

16      **MR. HOLLOMON:**  Well, Judge, they were -- part of the

17 problem has been my office is in Jackson and my client is here

18 in Lafayette County, and trying to coordinate the exchange of

19 documents that were forwarded to him and the work he did on it.

20 I apologize for that.  It should have been filed earlier.  But

21 because of that; changes being made, corrections, it ended up,

22 Judge, where we forwarded it by mail from here.  Not from my

23 office.  But my client FedExed it to the chambers of the Court.

24      **THE COURT:**  Okay, the chambers of the Court.  We

25 didn't -- we have not received anything.  Now, we have been

REDACTED TRANSCRIPT 12

1  here in Oxford for the past day. So, we don't have anything.

2  If we had, we would have docketed it, although it is Counsel's

3  responsibility to docket those things. But we don't have any

4  such mail to speak of.

5      Mr.~Houston, did you keep copies of anything?

6           THE DEFENDANT: Yes, ma'am.

7           THE COURT: Do you have copies of it with you now?

8           THE DEFENDANT: Yes, ma'am.

9           THE COURT: If you have those copies and you can

10  provide them to the Court, I will consider them.

11           THE DEFENDANT: Yes, ma'am. I have them right here.

12  I actually brought this file for you, just in case.

13           THE COURT: Excuse me?

14           THE DEFENDANT: I actually brought this file for you

15  just in case.

16           THE COURT: I think that's probably a good thing

17  to do.

18      So, what I am understanding that will be brought before

19  the Court are the exhibits that were mailed to the Court that

20  were intended to be attached to the Sentencing Memorandum?

21           MR. HOLLOMON: Yes, Your Honor. Are referenced in

22  the Sentencing Memorandum.

23           THE COURT: Uh-huh.

24           THE DEFENDANT: Let me make sure that's part of it.

25      That's all.

REDACTED TRANSCRIPT

13

1    **MR. HOLLOMON:**  Right here?

2    **THE DEFENDANT:**  Yes.

3    **THE COURT:**  That's quite a lot.

4        I presume, Mr.~Houston and Mr. Hollomon, that you-all want

5    me to take into consideration what is contained in this stack

6    of documents?

7    **THE DEFENDANT:**  Yes, ma'am.

8    **THE COURT:**  Since I've just had -- you've just handed

9    them to me, I've not had the opportunity to review them.  Is it

10   possible for you to sum up their contents?  And I certainly

11   don't mind looking at them now.  I'm just telling you that this

12   is the first time I've seen them, and this is a big stack.

13   **THE DEFENDANT:**  Well, I can sum it up, if you've got

14   time.

15   **THE COURT:**  Oh, I'm going to have time.  Because,

16   again, you're going to have your opportunity to speak here.

17       Just one second.

18       Are there any reference letters as part of this exhibit?

19   **MR. HOLLOMON:**  There are, Your Honor.

20   **THE COURT:**  Do you-all have the names of the persons

21   who submitted the reference letters at this point?  And I know

22   I have your file here.  I see a couple here.  I just don't want

23   to leave anybody out.

24   **THE DEFENDANT:**  Yes, yes, yes.  Yes, Your Honor.

25   **THE COURT:**  It looks to me like most of them are

**REDACTED TRANSCRIPT**

14

1    towards the back of the stack?

2         **THE DEFENDANT:**  Yes, yes.  All of them are toward the

3    back.  The letters is -- the letters in the back it should say,

4    "Exhibits," which is the last exhibits, the letters from the

5    community organizations, spiritual children, family -- family,

6    friends, community organizations, pastors, and spiritual

7    children.

8         **MR. HOLLOMON:**  Your Honor, I believe it's the very,

9    very last part of the exhibits.

10        **THE COURT:**  I do see.  I'll tell you -- and

11   Mr.~Houston and Mr. Hollomon, you may have recalled from the

12   change of plea hearing that I don't set a deadline for

13   reference letters because I know sometimes they are last

14   minute.  But I always encourage you-all to try to get them in

15   to the Court early, because if you don't, I don't have the

16   opportunity to read them before I come to sentencing.  And this

17   is one of those occasions.

18        **MR. HOLLOMON:**  It is, Judge.  And I take

19   responsibility for that.  They were -- I had originally asked

20   Derrick to have them sent to my office, so that I could then

21   ensure they were copied and distributed.  But they ended up

22   coming primarily to Derrick.  He had them here in Lafayette

23   County.  And so he mailed them directly via FedEx, and I did

24   not have them, Judge, or I would have done so.  And I know

25   this, it presents a difficulty for the Court this morning.

1    **THE COURT:** Well, this is what it comes down to, for

2    me. Mr.~Houston, do you wish the Court to take what is in

3    these reference letters and the rest of the attachments to the

4    Sentencing Memorandum into consideration?

5    **THE DEFENDANT:** Yes, ma'am.

6    **THE COURT:** Would you like the Court to have reviewed

7    them before I sentence you?

8    **THE DEFENDANT:** Yes, ma'am.

9    **THE COURT:** I'm not going to be able to do that

10   today, then. I'm just telling you. I'm glad counsel is here.

11   We're going to continue sentencing. And let me go ahead and

12   give you a date. I will come back to Oxford for it.

13   I hesitate to proceed with something where a defendant has

14   submitted items that the Court has not had the opportunity to

15   take into consideration. And I believe I told you, and I know

16   this for myself, that there are many times that what is stated

17   in those reference letters changes the Court's opinion about

18   how I may sentence a defendant. So, it is serious enough for

19   me to have to continue this sentencing hearing.

20   Actually, I may be able to come back next week. I have

21   some other hearings set. But I will check and see if I can get

22   those changed to Oxford as opposed to Greenville. And I could

23   be back here next Wednesday.

24   Mr. Hollomon, how is your schedule?

25   **MR. HOLLOMON:** Your Honor, I'll clear my schedule.

**REDACTED TRANSCRIPT**

16

1  I'll be here.

2        **THE COURT:** Mr. Stringfellow?

3        **MR. STRINGFELLOW:** I will make myself available, Your

4  Honor. Whatever it takes.

5        **THE COURT:** And, Mr. Stringfellow, you -- as long as

6  you -- everybody heard that in the courtroom. Because I know

7  sometimes the AUSA, that you-all have different schedules. But

8  I do think it's important in this case that you be here --

9        **MR. STRINGFELLOW:** Absolutely.

10       **THE COURT:** -- and not have someone sub for you.

11       **MR. STRINGFELLOW:** I plan to.

12       **THE COURT:** All right. I will be back next

13  Wednesday, and I'm telling you-all it will probably be set at

14  10:00 or 10:30. Small possibility it may be in the afternoon.

15  Any preference? I know, Mr. Hollomon, you're coming from

16  Jackson.

17       **MR. HOLLOMON:** If the Court please, if we could set

18  it in the afternoon, it would -- it would be better for me. I

19  could get here and then meet with my client before the hearing.

20       **THE COURT:** Okay. I think if it's the afternoon, it

21  may have to be 2:30. So that's what I'm telling you

22  tentatively. I'll try my best. Otherwise, it -- I think the

23  earliest -- or the latest it could be in the morning is, like,

24  10:30. But I'll look at 2:30. You-all will receive the Notice

25  accordingly.

REDACTED TRANSCRIPT                                    17

1      Now, the question I had is to the extent that you've told

2    me I have a -- some mail coming with this in it, what I would

3    suggest you do, Mr. Hollomon, is come; get back Mr.~Houston's

4    file and go ahead and file this information on the docket in

5    this case.  So, you can come forward and get the stack.

6      Ms. Bryant.

7      To the extent that those are attachments to the Sentencing

8    Memorandum, Mr. Hollomon, you understand that they will need to

9    be filed as restricted access?

10          **MR. HOLLOMON:**  I do, Your Honor.

11          **THE COURT:**  When we started this hearing,

12   Mr.~Houston, to the extent that we have begun it, and I'm going

13   to take those into consideration.  So we can move through some

14   other things as we move forward.  And I would like to go ahead

15   and proceed with some things, so we won't have much to pick up

16   once we're done.

17      I want to move next, then, to your guidelines,

18   Mr.~Houston.  I know a lot of times it makes it seem like

19   sentencing comes down to numbers.  But I have to start with the

20   guidelines in order to proceed with the sentencing in your

21   case.  Your offense level is 32.  Your criminal history

22   category is 6.  And that produces the following guideline

23   ranges:  Imprisonment for 210 to 240 months, supervised release

24   following imprisonment for one to three years, a fine of

25   $35,000 to $250,000, and a special assessment of $100.

REDACTED TRANSCRIPT
                                                                18

1        Under the guidelines, Mr.~Houston, you are ineligible for

2   probation.

3        Does any party take issue with the guidelines as stated by

4   the Court?

5            **MR. STRINGFELLOW:**  No, Your Honor.

6            **MR. HOLLOMON:**  No, Your Honor.

7            **THE COURT:**  Mr.~Houston, there are certain statutory

8   factors that the Court is bound to consider in determining your

9   sentence.  The goal is to make sure that I impose a sentence

10  that is sufficient but not greater than necessary to comply

11  with the purposes of sentencing.

12       Now, the purposes of sentencing are multifold.  They

13  include the need for the sentence to reflect the seriousness of

14  your crime, to promote respect for the law, and to provide just

15  punishment for your crime.  The sentence should also serve to

16  deter criminal conduct, protect the public from future crime,

17  particularly by you, and a very important factor is to promote

18  your rehabilitation.  But even further, the Court must consider

19  the nature and circumstances of the offense, your personal

20  history, background and characteristics, the types of sentences

21  available, and the need to avoid unjustified disparities among

22  defendants who find themselves in the very same position that

23  you are now with respect to the crime and with respect to the

24  guidelines applicable to your case.

25       These are matters that I have considered; will continue to

REDACTED TRANSCRIPT

19

1   consider up until the time that I pronounce sentence.  I wanted

2   to mention them to you to the extent that you may want to

3   comment on any of them or maybe even your counsel.

4        So, although we're going to continue your case again, I

5   want to get as much done today as we can.  I want to invite you

6   now, if there is anything you want to tell the Court -- and I

7   will give you the opportunity again next Wednesday.  But if

8   there's any statement or anything you'd like to present to the

9   Court, this would be the time to raise it.  Is there anything

10  you would like to say?

11       **THE DEFENDANT:**  Yes, Your Honor.  When it comes to my

12  criminal history, I was -- I was still a teenager, you know.

13  I'm sure you know from my records, I've been incarcerated

14  actually since it dated back as a teenager.

15       I think that I got started out early, you know, as a

16  child, and I was immature, you know.  And I -- at some point, I

17  used to always think about where would I be at or how old would

18  I be when I go through my transformation and become a boy to a

19  man, you know.  Never knowing that it would be in prison, you

20  know.  I left my parents 20 years ago.  This is my first time

21  seeing them in 20 years, you know.  And it's because of me,

22  because I had been locked up with so many guys who were so

23  excited about their parents coming to see them in the distance,

24  and they never made it.  So, I didn't want to be selfish and

25  nothing happen to my parents.  I would rather for them to stay

1    there till I try to make it back to them, you know.

2       Well, Your Honor, I was baptized at the age of seven.  I

3    didn't know what baptism meant, you know.  And I went through

4    life.  I had a car wreck, and I almost died at the age of 16.

5    And after that car wreck, I turned towards the Lord.  And then

6    I eventually got back in the street.  I end up joining a gang

7    after school.  Didn't even know what I was a part of.  I was

8    just with some friends.  And after school, we went behind the

9    house, and we was in a circle.  And they was talking about

10    righteousness.  And so I thought I knew what righteousness was.

11    So I said, you know, "Hey, I think this is righteous."  So they

12    asked me what branch was I.  So, I was, like, "What you mean?"

13    He was, like, "You GD?  BD?"  So I said the first thing that he

14    said, "GD."  He said, "Oh, okay, you're GD."

15       So, from that day on, I became a part of something and

16    didn't even know what I was a part of.  I didn't find out what

17    I was a part of until I had turned 40 years old.  But during

18    that time, I thought I was a part of something righteous.

19    Because in the concept of the teachings, there's nothing about

20    killing, there's nothing about stealing, there's nothing about

21    disrespect.  It speaks against that, you know.  I went through

22    life on the outside and the inside.

23       I used to sit in front of the detectives looking with my

24    daddy.  As a child, the detective used to tell me I was a part

25    of a gang.  I used to get mad at them, and tell them I'm a part

REDACTED TRANSCRIPT

21

1   of a righteous organization.  Because this is what I thought in

2   my mind, you know.  Because of the teachings.  I knew the

3   teachings.  There wasn't nothing in there negative.  I ended up

4   going to prison.  And in prison, I ran into another gang that

5   was inside of a gang.  And they was an institution themselves.

6   And they started with the talk about -- they used to -- I was a

7   standard member.  And they used to bully, extort; you know,

8   rock us to sleep.  They call it rocking to sleep.  I call it

9   when they tell you something, they trick you.  And I felt like

10  that wasn't righteous.  But if you was a standup guy, they

11  tried to recruit you.  So, I felt that they was treating the

12  guys wrong.  So I said, you know -- they asked me to be a part

13  of them.  I said, "No, I still got my family," you know.  But

14  you had to have a whole lot of time.  But I still had my

15  family, so I went, no.  And I made a decision.  I said, if I

16  ever become a part of them, I'm going to go up to the top and

17  I'm going to stop that.  I'm going to stop them from extorting

18  the guys and doing them wrong.

19       But as time went by in prison, I ended up in the hole a

20  lot.  I was going through a lot, and I used to always ask God,

21  "Why is this going on?"  You know, "What's going on?"  And I

22  never got an answer.  But everywhere I went, I always remember

23  the verse said that, "Blessed is he who comes in the name of

24  the Lord."  So, I always made the statement wherever I went,

25  "Blessed is he who come in the Lord.  Lord, I come in the name

REDACTED TRANSCRIPT

1    of Jesus." Didn't know why I was saying it. Just remembered

2    the verse.

3        Well, in 2017 -- in 2017, I was sent to Parchman. I had

4    been through Parchman before. And I was part of a class action

5    lawsuit, you know, for the conditions of confinement. And I

6    got -- we got the ACLU down there. The ACLU transferred all of

7    us out. Sent us to Green County. And then the conditions of

8    the confinement were still violating our Eighth and Fourteenth

9    Amendment, with racist slurring; abuse of prisoners. You know,

10   I put all that in -- you know, I start -- I keep a -- I keep

11   documentary evidence. Everything I've been through, I keep a

12   record of it, you know.

13       And so I went to Parchman in 2017, and it was history

14   repeating itself. And history was repeating itself, and it was

15   worser this time, though. When I say it was worser, I mean

16   rats running around all over the bed with you, roaches

17   everywhere tearing up your pictures; destroying your property.

18   It was horrible. Nobody knew how to get, you know, some

19   attention, because they always -- the system was -- it was

20   designed to try to keep the public from knowing what was going

21   on the inside, you know. But I had been through it before.

22   I litigated with the *Presley v. Epps*. I also litigated with

23   the SMCI; got the ACLU down there from Washington D.C. And

24   they investigated and found out the claim was true, and they

25   ordered Christopher Epps to transfer all of us out there. And

REDACTED TRANSCRIPT

1  we went to better facilities.

2      But being back in Parchman in 2017, it was worser than it

3  was before, and nobody knew what to do.  Guys knew that I was a

4  part of getting guys -- getting the ACLU, Ms. Margaret Winter,

5  from Washington D.C.  So they wanted me to, you know, litigate

6  for them.

7      Well, I wrote the Southern Law Poverty Center.  They

8  needed evidence.  Because for a class action, can't one person,

9  you know -- you're familiar with that.  Civil, can't no one

10  person bring but one class action.  So, every time we tried to

11  go through prison litigation, the prison would block our

12  complaints.  So I ended up starting -- founding the Mississippi

13  Incarcerated Family Advocate; you know, uniting the inmates and

14  the families.  And I used to have them to go down to the State

15  Capitol and raise awareness, you know, to the political team

16  about what we was experiencing.  It was all on the news for

17  years.  It took four years.

18      Well, then, we still couldn't get no help.  I raised

19  awareness.  I seen -- I foreseen what was going to happen in

20  the future.  So I raised awareness on the lack of staff, the

21  health hazard, the safety hazards with MDOC.  Because in

22  Parchman, you know, even the officers are affiliated, you know.

23  They are affiliated.  You didn't know who to trust.  I can say

24  that, because I even had officers that I used to deal with,

25  you know.

REDACTED TRANSCRIPT                                24

1        And so after raising awareness, they still wouldn't zoom

2   in on us.  And one day, the Southern Law Poverty Center, they

3   wanted evidence.  We was complaining about all the rats,

4   roaches, the waters having feces in it.  They end up coming

5   later and testing the water.  The water actually had feces in

6   it.

7        I had a lot of friends that died.  Some, you know, didn't

8   have no hope, so they committed suicide.  They felt like no one

9   cared about us, you know.  Some died from medical -- from a

10  lack of medical attention.  One tooth might take three years to

11  never.  I had a toothache; I never was able to get it pulled.

12  It never -- it ended up falling out, you know.  That's how

13  horrible it was.  But what happened was -- you had to be in the

14  system to know the history.  What happened was when Christopher

15  Epps got convicted in 2014, '15, the legislature feared giving

16  any other commissioner funds, rehabilitation funds, funds for

17  staff.  So there wasn't really any rehabilitation programs,

18  period.  Staff -- sometimes we had no staff accounted.

19  Sometimes, we had no staff working, you know.  And we had

20  to -- and I raised that awareness.  And I had the families and

21  the Mississippi Incarcerated Family Advocate go down to the

22  state Capitol and raise that awareness, too.

23       Well, we ended up, when the Southern Law Poverty Center

24  seen this, they asked me was there anybody could verify it.

25  So, everybody could verify it.  So I handled the interview with

REDACTED TRANSCRIPT

25

1  all the other people.  So everybody was on one accord.

2  Everybody was saying the same thing.  I was a part of a gang,

3  you know.  And I was a part of the political board, you know.

4  The gang thought they was, you know, doing me a favor by it,

5  because they knew that's what I do.  I litigated, you know.

6  And when I was a part of the political board, I knew that

7  that's what it was going to take to raise the awareness to the

8  public.  And after I raised awareness, the gang got mad, the

9  leaders.  The leaders got mad, and they started trying to bring

10 charges up on me for everything.  I'm talking about anything

11 and everything.  Because I was exposing Parchman.

12      I'm sure you've seen it on the news in 2020, Exposing

13 Parchman, with Jay-Z and Yo Gotti, and all those coming down,

14 you know.  I initiated that.  I'm the one that had the people

15 to contact them.  And they reached out.  They reached back out.

16 They heard our cry.  They heard our voices.  But so many people

17 had died by then, you know.  So many people had died by then.

18 One died from medical -- lack of medical attention; one died

19 from committing suicide.  My best friend died, you know.

20      And when we ended up speaking with Southern Law Poverty

21 Center, they -- they tried to help us.  They tried to help us.

22 But MDOC, they made it that much harder.  We had to go to the

23 root of the problem.  The root of the problem was they weren't

24 getting enough funds to hire more staff.  They weren't getting

25 enough funds to start rehabilitation programs.  So what I did

REDACTED TRANSCRIPT

26

1   was, you know, I started a rehabilitation program myself.  I

2   created How to be a Entrepreneur, Life Skills.  I created so

3   many programs, you know, and had certificates.  To give the

4   guys something to do.  Because a idle mind is the devil's

5   playground, you know.  The system was designed for

6   rehabilitation.  But guys were getting out worser than they

7   were coming in, you know.

8        So I ended up leaving Parchman.  I left Parchman in 2019.

9   By the time I left Parchman, you know, we had raised awareness

10  in a major way.  Jay-Z and them started looking into it.

11  Yo Gotti and them started looking into it.  Southern Law

12  Poverty Center, they started looking into it.  Well, on

13  December the 31st, 2019, we hear that inmates broke out of

14  their cells at Parchman.  Took the keys from the guard -- the

15  one guard.  Wasn't nothing but one guard that was guarding two

16  or three hundred inmates.  They went inside a guy's cell, and

17  they killed a lot of guys.  But before they did that, before I

18  left, I ended up telling the guys, "Look, we got to show them

19  how serious this is.  We got to give up our prison knives.

20  Give up the knives."  And tell them we'll give up prison knives

21  for a change in the conditions.  We want a rehabilitation

22  program, you know.  Because this environment is so violent.

23  It's so violent.  We have to be able to show them that we

24  really do want change.  So, we gave up the prison knives.

25        It was all in the newspaper.  I added that in part of the

REDACTED TRANSCRIPT                                          27

1   record, too.

2        And all those guys that got killed because they didn't

3   have no knives, some of them blamed me for it.  People blamed

4   me because I happen to exchange their knives for better prison

5   conditions, you know.

6        I got a case that you're looking at on that indictment

7   there; you know, it talks about the officer, you know.  But if

8   I'm not mistaken, that officer still works in Parchman.  That

9   officer was affiliated also, you know.  The record reflects

10  that officer plotted with other inmates to rob them, you know.

11  I got that.  That's part of the record, too.  Everything I'm

12  telling you, it's in the discovery.  It's all in the -- it's

13  all in the discovery.  Everything I'm saying; everything you've

14  got, it's all part of the discovery, you know.

15       So I left Parchman.  And all those guys that got killed in

16  2019, it was on the news.  They having dead bodies all over the

17  news.  Guys putting it all on Facebook.

18       I ended up in the hole.  When I got to the hole, I asked

19  God, "Why?  Why, every time I turn around, I'm in the hole?"

20  But God told me, he said, "Son, review why every time you've

21  been in the hole."  So I thought.  You know, the Holy Spirit is

22  a spirit of remembrance.  It reminds you.  So I thought about

23  why every time I was in the hole; why every time I was in bad

24  prison conditions.  And it was gang-related.  Then the Holy

25  Spirit said go to I Galatians, Chapter 1, verse 6 through 9.  I

**REDACTED TRANSCRIPT**

28

1  went to first -- I went to Galatians, Chapter 1, verse 6

2  through 9, and it read, "He who receives another gospel, other

3  than the one he have received, let him be a curse."  Because I

4  was thinking I was under a generational curse.  I had got to

5  the point where I was asking God to forgive my mom's sin, my

6  dad's sin; their mom; their dad's sin, and they -- you know,

7  generations back.  And so when it said that "He who receives

8  another gospel other than you -- other than the one you have

9  received, let him be a curse," I said I received Larry Wooten

10  teaching at a young age, so this -- but it's a righteous

11  organization.  Then the Holy Spirit told me -- I'm talking

12  about a audible voice.  I heard a audible voice.  It said,

13  "Now, go to Jeremiah 17:5."  I went to Jeremiah 17:5 and it

14  read it.  "Cursed is the man who trusts in man who put they --

15  and who put their strength in human beings."  I said, "Well,

16  I'm a man."  And I always trusted, you know, myself.  I trusted

17  my ability.

18      And so I started to see things different.  And then it

19  took me to Romans 3 and 23, and said, "The righteousness of God

20  is to all and upon all those who believe in Christ Jesus."

21      So, I started looking at righteousness in a whole another

22  aspect.  I was thinking I was a part of righteousness.  And God

23  said, "Man's righteousness is a filthy rag to His."  So all

24  that time that I had been thinking that I was a part of

25  something righteous, I wasn't a part of nothing righteous.  The

REDACTED TRANSCRIPT
                                                                    29

1  righteousness of God is upon -- it's to all those who believe

2  in Christ Jesus.  So I went on to read the Bible.  I buried

3  myself in it for a whole year straight, fasting and praying,

4  just to realize in James 4:4, it says, "A friend of the world

5  is an enemy of God."  I was of the world.  I was living and

6  operating.  I had been taught by the ways of the world.  But I

7  didn't know that I was on the enemy's side.  I didn't know a

8  friend of the world was an enemy to God.  I didn't know that.

9      So I went on to repent.  I'm talking about, you know, true

10 repentance.  You know, I found out, you know, through the Holy

11 Spirit that repentance comes with two folds.  You have a

12 foundational repentance, and then you have a confessional

13 repentance.  The foundational repentance was, you know, you

14 have to tell God when you see the truth that you're a part of

15 the kingdom of darkness and you had been used to doing things

16 your way according to man, and you realize that you was doing

17 it the wrong way.  Instead of trusting in Him, you was trusting

18 in yourself.  You were trusting in man.  So, I laid the

19 foundation of true repentance; I repented from the heart.

20     And once I repented, that's when the Holy Spirit sure

21 enough started talking to me.  He started giving me revelation

22 after revelation after revelation, you know.  And no preacher

23 came in the prison to teach me.  But, you know, I got a -- I

24 can't -- I got to add my wife to it, because my wife is a

25 prophetess.  And she taught me a lot.  She taught me about the

REDACTED TRANSCRIPT

1   spirit realm. You know, God brought her into my life and --

2   and at the right time, you know. Because I never knew nothing

3   about -- like I said, I was baptized at a young age, but the

4   preacher didn't tell me that I was going to be going into the

5   wilderness and not be tested and would be a free journeyer.

6   So I ended up burying myself in the Bible for a year. The

7   Commissioner -- well, the ATF -- the ACL came to see me. They

8   said, "Man, we're -- we heard that, you know, you was involved

9   in all this that's going on." So, I told them exactly what I'm

10  telling you now. You know, I'm going to -- it was all in

11  Parchman. Started in Parchman. You know, it was the push for

12  change. You know, the gangs ran it. You know, a lot of people

13  were forced to be in gangs, because wasn't no officers -- if

14  you tried to drop out, there was nobody to drop out to. And

15  then, you know, we had a leader that he ended up speaking with

16  CID, the investigator. And some type of way, everything that

17  he told ended up across the whole state on audio. And he got

18  stabbed; almost killed to death -- almost killed. That's part

19  of the discovery, too. So when we made complaints. They went

20  on deaf ears, you know.

21  So I buried myself into the Bible. And, you know, it was

22  something I loved. I buried myself into the Bible.

23  And ATF came to see me. And I told the ATF, you know,

24  what was going on. They ended up saying that, you know, they

25  was going to send me out of the state. I said, okay. I wrote

REDACTED TRANSCRIPT 31

1  the Commissioner, and I told the Commissioner of MDOC, I said
2  that, you know, for years I've been in this prison, and I
3  haven't been a model inmate. I said, "They call me Psycho." I
4  said, "I came into prison, and the first person asked me what
5  was my name, I wanted to appear hard. I didn't want to appear
6  like somebody that was soft that they could push over. So I
7  gave myself that name, you know." I wanted somebody else to,
8  you know, fear and not be trying to push over me. I said, "But
9  I haven't been a good inmate, a model inmate but, you know,
10 people think I'm at war with my own kind. But it's actually a
11 spiritual war. Satan mad because I done switched sides now."
12     So I was, you know, breaking everything down to him. And
13 two weeks later, he came to see me. And he had Moody, the
14 Bible institute with him. And he said, "I got your letter."
15 He said, "You told me people think you're in a physical war but
16 you say you're in a spiritual war." He said, "Tell me about
17 the spiritual war." So I go to telling him everything, you
18 know, about how all my life I thought that I was a part of
19 something righteous. And it wasn't until I went to the hole;
20 then my wife sent me a book by Pastor Rebecca Brown that say he
21 came to set the captive free. And I read that book and found
22 out that all gangs are occults. I didn't know gangs was an
23 occult. I had made a covenant with Satan and didn't even know
24 it. But, you know, he don't care nothing about that. So once
25 I found out I was with an occult, I knew I wasn't going back.

32

1   So when I told the Commissioner this, the Commissioner, he know

2   the word.  He's a very powerful man of God.  He said, "Well,

3   you can call this a divine intervention."  He said, "Because I

4   ain't sending you to the feds."  He said, "As a matter of fact,

5   where do you want to go?"  I said, "I want to go to G

6   building."  He said, "I'm going to send you to G building and

7   put you in a Bible school."  He said, "I want you to go around

8   the whole MDOC and preach the word of God, because you're on

9   fire for God.  Let's show the investigators don't know their

10  job."  So, he did that.

11      I went to G building; joined the ministry school, joined

12  the mentor school.  And, you know, me and him write back and

13  forth.  I also added those letters, too.

14      And then one day, Mr. Sam come to see me.  And Mr. Sam

15  said, you know, "Hey, they are about to indict you."  But I

16  didn't believe him.  Because I wasn't thinking about my past.

17  I wasn't thinking about my past.  My wife told me, and God told

18  me you're about to experience -- you're about to experience

19  something, but don't worry, He'll see you through.  Satan has

20  requested to sift you as wheat, just like he did Peter.  But

21  once you overcome, go back and strengthen the brethren.

22      So two weeks later, or a couple weeks later, I end up

23  indicted; come to Oxford.  When I come to Oxford, I didn't

24  focus on my case.  I focused on God's word.  All the guys who

25  had -- you know, who was locked up where I'm at, God gave me a

REDACTED TRANSCRIPT

1    dream, and in this dream, He told me He needed me to activate

2    their faith.  So, guys were stuck in a place.  They knew God;

3    they knew Jesus, but they didn't know Him in the power of His

4    resurrection.  So, God used me to minister to the guys.  I have

5    seen many of them -- as a matter of fact, the Holy Spirit is 25

6    to 0 today.  They was in impossible circumstances.  Their

7    lawyer telling them, "It's impossible for you to go home."  The

8    jail administrator telling them, "It's impossible for you to

9    get probation."  But I say the word got final authority.  You

10    got to stay steadfast in the word.

11        God said in Romans 3 and 4, "Let the word of God be truth,

12    and let every man be a liar.  Cursed is the man who put their

13    trust in men."  So they stood on the word, and then went home.

14        I ended up, Doc and -- got the prison minster, Jerry --

15    Mr. Doc -- Mr. Harland and Mr. Todd, they from the prison.

16    They can verify what I'm saying, just the Holy Spirit and how

17    it moves.  You know, it's been a revival going on.  And God

18    used me to be a part of that revival.  I'm glad to be a part of

19    it.  Because I turned to the truth, and I've been led by the

20    Holy Spirit.  And had I of knowed years ago, after I got

21    baptized, that I would be tested as Jesus was tested -- see,

22    Jesus passed the test.  When he got baptized, he was sent into

23    the wilderness; he passed the test.  But I got baptized, and

24    nobody never told me that I was going to be tested.

25        But God has a purpose for all of us.  When I had that car

REDACTED TRANSCRIPT

34

1   wreck, you know the older people tell you, "God didn't take

2   your life.  He's got a purpose for you.  He's got a purpose for

3   you."  So, I always said, "God, what's my purpose?  What is my

4   purpose?  What is my purpose?"  Well, I found out what the

5   purpose is.  He didn't kill me.  I could have died in prison

6   these twenty years.  He didn't kill me then.  He didn't kill me

7   when I got in the car wreck.  Because he knew that it would --

8   he would need someone to reach those prisoners.

9       I had a prophet tell me, "You're locked up so others may

10  be free."  I didn't want to hear that.  He said I'm locked up

11  where others may be free, but it don't feel good locked up, you

12  know.  I'm suffering.  I'm being afflicted.  But through my

13  afflictions and my pains and my suffering, that's who -- that's

14  what made me who I am today, you know.  God had moved in an

15  amazing way in my life.

16              **UNIDENTIFIED SPEAKER:**  Amen.

17              **THE DEFENDANT:**  I remember when I didn't even want to

18  get out of prison, because I felt like, you know, where I was

19  at at the time, you know, it was good.  I remember somebody

20  asking me, "Hey, you ready to come home?"  Home seemed far off.

21  My mind was saying, yeah, but at the same token, I was, like,

22  no, I ain't ready to come home.  So I ended up -- I said, "God,

23  it seems like I'm being led by a spirit."  And I actually was

24  led by a spirit.  Every time I try to get my case back in

25  court, it's like it push itself back, push itself back, push

REDACTED TRANSCRIPT

35

1   itself back.  I just did twenty years now, and litigated the

2   whole twenty years to try to get out.  That entire -- I'm still

3   litigating, to try to prove that I just did twenty years for a

4   crime I didn't commit.

5        And the crime was so simple to the point where the robber

6   had -- was on video.  And they ended up not sending the video

7   to the expert.  It took me thirteen years to get the video out

8   of evidence and to find -- it took me two more years after that

9   to get it sent to an expert.  And then the expert kept it for a

10  year and said he was on his dying bed; he needed the original

11  copy.  So we got the original copy; and he didn't want to deal

12  with the case.  So we sent it to another expert in Arizona.

13  And the expert in Arizona, he kept it two years.  And then the

14  Mississippi Innocence Project, they went down there, because

15  they got my case, they said that the trial attorney, he ended

16  up quitting.  So it was like the spirit of delay.  I didn't

17  know what it was.  But my wife told me, when I met her, that's

18  the spirit of delay.

19       So, to sum it all up, the twenty years, it took that to

20  break me.  The time that I did, it took that to break me.  I

21  became a -- I went from a boy to a man in prison, you know.  It

22  took me twenty years to give me patience.  I didn't have

23  patience, you know.  If I wanted something, I wanted it now.

24  You know, people used to say, "Patience is a virtue."  Man,

25  patience is a virtue.  I said, "Yeah, patience is a virtue.

**REDACTED TRANSCRIPT**                                    36

1   But too much patience can hurt you, you know." It took twenty

2   years for me to have patience. It took twenty years to bring

3   me to the end of self. It's not me that no longer live. It's

4   Christ live through me now.

5              **UNIDENTIFIED SPEAKER:** Amen.

6              **THE DEFENDANT:** And I didn't even know what I was

7   going to say when I came here. I know the Bible tells us in

8   Luke, I think it's 11 and 19 -- or 12 and 11, that when they

9   bring you in front of the magistrate or the judges, or the

10  synagogue, don't worry about what you shall say or how you say

11  it. A answer will be given to you in that very hour by the

12  Holy Spirit. I never thought about what I was going to say.

13      When I got to Oxford, I never worried about my case,

14  because God told me just as Moses lifted up the serpent in the

15  wilderness, you know, the children of Israel, they was at war

16  with the Tribe of Ai, and they was losing it. The people

17  was -- they outnumbered them. They out-strengthened them. And

18  so God said, "As long as you look up on the bronze serpent,

19  you'll start to weave and wobble." So God told me, "Focus on

20  me, and let me focus on the battle."

21      So I focused on God's work the whole time I was in Oxford,

22  you know. I never even thought about my case. My lawyer told

23  me, "Man, you got more patience. I wish all my clients was

24  like you."

25      I know God is a sovereign God. So, I knew he had his own

REDACTED TRANSCRIPT                                    37

1   ways of delivering.  I didn't know how he was going to do it.

2   You know, I didn't know what he was going to -- or how he was

3   going to do it.  But I knew, when you become baptized, then the

4   Bible says in Mark 16:16, you know, "He who believes and is

5   baptized shall be saved."

6        So I focused on the -- all the guys over there at the

7   jail.  And right at two years -- I could have been here.  I

8   kept asking for the continuance, continuance, continuance,

9   continuance.  But every time I asked for a continuance, I felt

10  like there was more work that God needed me to do over there,

11  you know.

12       And being here today, I thought that we was going to be

13  able to conclude it, you know.  I've been keeping up with my

14  codefendants' case.  And I thought I was going to come to court

15  today and this was going to be my last day.  But it was

16  important to me that you read what, uh -- that memorandum.

17  Because I actually put that together myself.  My lawyer, he

18  doesn't really know the history of MDOC, you know.

19       I'm not saying that I didn't commit a crime, because I did

20  commit a crime.  And I take responsibility for committing the

21  crime.  My whole point of putting that memorandum together was

22  to raise your awareness as to what it was on the inside, what

23  it was like, the lack of rehabilitation programs, the lack of

24  staff members, putting in a -- being placed in a situation

25  where it was no staff member to report things to, no one to

**REDACTED TRANSCRIPT**                                    38

1   keep you safe.  I just wanted to raise your awareness with the

2   memorandum that you have.

3       And I thank you for allowing me to share part of my

4   testimony with you.  When I was here the last time, you said

5   that you'll listen to every word, and you'll read every word

6   that's written to you.  And that meant a lot to me, you know.

7   That meant a whole lot to me.  So, I had people that was a part

8   of it.  People that was a part of that that watched it and

9   witnessed it to write you also, you know.

10      Also, I did some research on you.  Because, you know,

11  you're the Chief, you know.  And I go all the way back to

12  Operation Shoestring.  So, I thought about I heard that before,

13  Operation Shoestring.  Well, in 2013, I created -- I founded a

14  non-profit organization called Visions for a Betterment which

15  was dealing with at-risk kids.  I started a summer literacy

16  youth program.  And Operation Shoestring was what we tried to,

17  you know, support us in the programs.  So I was, like, "Wow, I

18  know her."  But I don't know her.  I know she's a part of

19  Operation Shoestring.  But, you know, I did a program and

20  submitted it to Operation Shoestring.

21      But I seen -- I seen the future back then.  This was in

22  2013.  I seen the future, and I felt like I knew what it took

23  to reduce child obesity, and reduce the dropout rate.  You

24  know, I felt like I knew all that.  And I do believe, you know,

25  that I played a part in a lot of children, you know,

REDACTED TRANSCRIPT                                    39

1    reducing -- being reduced from child obesity.  Because

2    Mississippi was ranking, I think, number one back then, you

3    know, in child obesity.  And the dropout rate was up there

4    also.

5        So if I'm not mistaken, when Operation Shoestring, back

6    then in 2013, I think you was included in that.  So I felt that

7    it was by grand design that I was -- you know, that you were my

8    judge, you know.

9        But that's all I have, Judge.  I just wanted to share a

10   part of my testimony with you.  I thank you for allowing me to.

11           THE COURT:  It is your right, Mr.~Houston, to make

12   these statements, and you have done so articulately and

13   eloquently.  And I'll tell you, it makes me wonder even more

14   so, before I came out to this bench and after I read the

15   Presentence Report, why you are here, especially when I read

16   your background.  You are the product of parents who have been

17   married for fifty years; who you've described as "great."

18           THE DEFENDANT:  Yeah.

19           THE COURT:  Both your parents are retired.  Your

20   father from Meridian Community College; your mother from

21   Meridian School District.  You reported that you were

22   well-loved and well-cared for growing up.  And I read as well

23   that you said that you were young and foolish --

24           THE DEFENDANT:  That's right.

25           THE COURT:  -- at some point.  Because I looked back

REDACTED TRANSCRIPT
40

1  at your criminal history, and your first conviction was in 2002

2  or so.  You were 21 at the time.  And I was trying to connect

3  you coming from this wonderful family where you're well-loved.

4  And clearly, again, you're an intelligent man.  How is it that

5  you even ended up with that first conviction that got you into

6  the system that had you presumably influenced to commit

7  subsequent crimes, and then get to the world where you are here

8  today.  Your prior convictions are all in state court.  This is

9  your first federal crime.  I'm not saying that your prior

10  convictions are any less serious.  Because they are all very

11  serious, because they have taken away your liberty.  But this

12  is the first time you've been in federal court.

13        **THE DEFENDANT:**  Yes.

14        **THE COURT:**  And not only that, you have been

15  classified as a career offender for the past crimes that you

16  have committed in conjunction with this crime.  And that has

17  some serious repercussions.  So, I tried to go back and look

18  again about what is it that went wrong here.  Because I do

19  believe something went wrong.  It may have been in your

20  thinking.  It may have been in your actions.  But in my mind,

21  given your upbringing and your background and what you were

22  offered in life, you shouldn't be here, Mr.~Houston.  Not just

23  because of this crime, but those that you've committed before.

24  So, you've explained to me that I guess you ventured into this

25  gang, and you thought it -- you know, the purpose of

REDACTED TRANSCRIPT

41

1  righteousness was manifested somehow in the gang, and that's

2  how you proceeded through it.  And it took you a very long time

3  to find your way to understand that that was not the righteous

4  way to go.  But unfortunately for you, it has cost you a great

5  deal, and your liberty, your association with your family, your

6  ability to be there for your children and all that goes along

7  with that.  We can't undo what has happened.  I always try and

8  understand why, though.  I'm glad that you have gotten to a

9  point in your life where you can look back and learn something

10  from it at this point.  Because although it may have happened

11  late, it's never too late to learn those things.  So, again, we

12  can't undo what is happening here.

13      My task -- it will be my task next week when we complete

14  your sentencing, is for me to announce the consequences of your

15  crime that has been committed in this case.  But it is very

16  disappointing, I would say, to see you here and to even look

17  back and see your initial crime that got you into the system

18  here that is reported here in the Presentence Report.  Because

19  it is something that I consider when determining what I believe

20  is an appropriate sentence.  And it is very unfortunate and

21  always saddened me that at such an early age that you were

22  incarcerated.  But those are always the consequences of our

23  acts.  You spoke about going from a boy to becoming a man.  And

24  those are the things that go along with that, being able to

25  accept responsibilities for your acts.

REDACTED TRANSCRIPT
                                                                    42

1          So here we are today.  I'm going to give your counsel the

2   opportunity to speak on your behalf.  I will probably have some

3   things to ask you about after I've read all of the information

4   that was meant to be attached to your Sentencing Memorandum.

5          But I'll ask you this one question now.  It may have a

6   short answer or whatever.  What were you going through such

7   that you did not finish high school to the extent -- was it the

8   eleventh grade when you dropped out?  Tenth, eleventh grade?

9               **THE DEFENDANT:**  Tenth.

10              **THE COURT:**  What happened?

11              **THE DEFENDANT:**  Do you remember what happened?

12          That's my first cousin.  My momma's sister's child.  We

13  went to school together.  We were raised up together, you know.

14  Unfortunately, he didn't -- I wound up in prison.  He never

15  went to prison.  But, you know, I joined a gang after school.

16  I played football.  I ran track.  I played basketball.  I was

17  good at it.  They used to call me "Houston the solution."  And

18  my momma told me one day -- she bought me a jacket.  And she --

19  she told me -- I let my cousin borrow the jacket.  And she told

20  me if I didn't bring the jacket home, that she wasn't going to

21  buy me nothing else.  And I was so immature, till I thought she

22  was serious.  And I started going to my aunt's house.  My

23  aunt -- my mom stayed in a nice neighborhood, you know.  A

24  neighborhood that there wasn't no trouble, wasn't no crime,

25  wasn't nothing.  My aunt stayed in a neighborhood where

**REDACTED TRANSCRIPT**

43

1  everybody was there it was crime.  And I was in the wrong place

2  and got around the wrong people.  And I couldn't take that

3  jacket home.  So I ended up going to my aunt's house all the

4  time and hanging with the wrong people.  That's when I joined a

5  gang that I didn't know nothing about.

6          **THE COURT:**  And you weren't going to school?

7          **THE DEFENDANT:**  And I wasn't going to school.

8          **THE COURT:**  So, did you drop out or were you kicked

9  out?

10          **THE DEFENDANT:**  I ended up getting kicked out on

11  purpose.  On purpose.  But I didn't know that, you know, for

12  years -- it haunted me for many years.  It haunted me.  It

13  haunted me.  Because I -- I used to always hear, you know, "You

14  could have been somebody on the football field.  You could have

15  been somebody on the basketball court.  You could have been

16  somebody on the track field."  And I had a car wreck after

17  that.  I almost lost my life, you know.  That slowed me down,

18  just to start --

19          **THE COURT:**  Not enough, though.

20          **THE DEFENDANT:**  Just to start going back to my house

21  when I got well.  And then I was actually -- I had started -- I

22  tried to get on the right track.  I started my own landscaping

23  business.  My dad helped me with it.  And one day I was at

24  home, and they showed somebody from Meridian on the news.  And

25  I knew who it was.  My whole family knew who it was.  The whole

REDACTED TRANSCRIPT

44

1  community knew who it was.  And they picked me up three days

2  later saying it was me.  And I knew it wasn't me.  The whole

3  community knew it wasn't me.  But trying to live by the code of

4  the street, not trying to tell them who it was, I didn't tell

5  them who it was.  And that cost me.

6          **THE COURT:**  Yes, it did.

7          **THE DEFENDANT:**  It cost me.  And when I got locked up

8  for a crime I didn't commit, that's when you said that 2002, I

9  was furious.  I couldn't believe that, you know.

10          They had a videotape.  The robber took his right hands and

11  jumped over the counter.  They went back and got fingerprints

12  and compared them to mine, and it came back no match.  The

13  victim stood in the courtroom and said, "Nobody here is really

14  sure of anything."  My lawyer said, "Well, I need you to be for

15  sure because, you know, my client is looking at life."  The

16  victim looked at me -- this is how foolish I was, now.  The

17  victim looked at me long and hard.  And I knew they hadn't

18  never seen me before.  I knew I hadn't never seen them before.

19  And I knew she was fixing to say, "He's not the one that robbed

20  me."  When I was young, I thought everything was funny.  I was

21  childish.  And I smiled.  I smiled because I'm knowing she's

22  fixing to say he's not the one.  Because I knew she wasn't

23  sure.  And she took that smile the wrong way.  I guess she took

24  that smile as if I was, you know, meddling with her or, you

25  know, boasting.  And that smile got me twenty years.

REDACTED TRANSCRIPT

45

1    **THE COURT:**  Well, it is unfortunate.  I mean, you are

2  43 years old now?

3    **THE DEFENDANT:**  Yes.

4    **THE COURT:**  You're still a relatively young man to

5  have all of this happen to you in your life.

6    **THE DEFENDANT:**  Yeah.

7    **THE COURT:**  But it is all about consequences, as you

8  well know.

9    Mr. Hollomon, would you like to go ahead and make a

10  statement now or wait until next week?

11    **MR. HOLLOMON:**  Your Honor, if the Court would allow

12  me just a few minutes.  I think what I have to say is that -- I

13  think my client eloquently, as the Court described it,

14  explained his past.  I didn't know him during that time.  I

15  take it for what it's worth.

16    I have known him for the past almost two years and have

17  worked with him very closely; spent a lot of time with him.

18  And I do know that now what he says to the Court, I think, is

19  true.  I think he is a very rare person who has totally

20  changed.  When I meet with him, he is always upbeat, positive.

21  He always is willing to reason with me, asks good questions.

22  He is pleasant.  He tries to help other inmates in the jail.

23  He has participated, according to the jail administrator,

24  Johnny McDonald -- Johnny has told me -- he wrote a letter for

25  Derrick -- that Derrick has been responsible for approximately

1    50 baptisms in the Lafayette County Detention Center since he

2    has been there.

3         The ministers that come and teach in the facility all know

4    him, and speak highly of him.

5         He is sincere in his beliefs and in his desire to change

6    his life and to try to effect the community and those around

7    him.  And I do believe, Your Honor, when Derrick does get

8    out -- he's forty-three years old; he will hopefully get out --

9    I believe he'll be a profound influence in the community in

10   which he ends up in helping people get away from gangs, get

11   away from substance abuse, and most importantly, get away from

12   violence.  And that is very much a change from who he was

13   twenty years ago.  But I do believe he has changed.  I believe

14   he's sincere.  And I believe he shows that every day.

15        That's all I have, Your Honor.

16        **THE COURT:**  All right.  Thank you.

17   Mr. Stringfellow.

18        **MR. STRINGFELLOW:**  Your Honor, in an abundance of

19   caution, before I speak, I would ask that the courtroom be

20   sealed.

21        **THE COURT:**  And closed?

22        **MR. STRINGFELLOW:**  Yes, Your Honor.

23        **THE COURT:**  All right, then.  To the extent that the

24   request has been made to have the court sealed -- and I can

25   imagine why -- I'm going to close the courtroom.  And anyone

REDACTED TRANSCRIPT

1    who is not a party, counsel, or federal court staff, you're

2    going to have to leave.  You will be allowed to return.  But

3    until then, you must exit now.

4         And I'll ask our security to please monitor the door as

5    well as the foyer to make sure that persons are far enough away

6    so that they cannot hear what's happening in the courtroom.

7         (COURTROOM CLEARED.)

REDACTED TRANSCRIPT



REDACTED TRANSCRIPT

51

1         **THE COURT:**  All right.  The court is now open.

2     (COURTROOM OPENED.)

3         **THE COURT:**  Mr.~Houston, I will tell you, when

4 everyone gets back in the courtroom, I actually would like to

5 know who has come and supported you here today.  You can just

6 identify them by name and tell me their relationship to you,

7 after everyone gets seated.  And then we will end the hearing

8 for today to pick up next week.

9     All right, court -- is everyone back?

10         **COURT SECURITY OFFICER:**  No, ma'am.  There's still

11 two or three that went to the restroom, I believe.

12     (PAUSE.)

13         **THE COURT:**  Mr.~Houston, we can start with those who

14 have come to support you who are here now.  And if anyone else

15 comes in -- well, actually I think someone is coming now.

16         **THE DEFENDANT:**  Okay.

17         **THE COURT:**  All right, then, Mr.~Houston, could you

18 identify for the Court who is here on your behalf to support

19 you today?

20         **THE DEFENDANT:**  Yes.  I'm going to start on the front

21 row --

22         **THE COURT:**  Uh-huh.

23         **THE DEFENDANT:**  -- to the left; moving to the right.

24 This is my nephew, Ladarron.  Ladarron was a problem child.

25     (LAUGHTER.)

**REDACTED TRANSCRIPT**

52

1    **THE DEFENDANT:**  He was a person -- he started out

2  young and -- you know, I was able to give more towards life in

3  prison and mentor to him.  And now he's the manager at Waffle

4  House, and has been for a couple years now, you know.  I've

5  been there -- he called me his dad.

6    **THE COURT:**  Ladarron, is that accurate, you were a

7  problem child?

8    **MR. LADARRON FIKES:**  Yes, ma'am, I was.

9    **THE COURT:**  Okay, then.

10    Okay, Mr.~Houston.

11    **THE DEFENDANT:**  That's my first -- I got to start

12  with him, because he just came in.  That's my cousin, Lavell.

13  This is my first cousin.  My mom's nephew.  Her sister's child.

14  Unfortunately -- you know, we played sports together, grew up

15  together -- I ended up in prison; he didn't.  You know, but he

16  is here to support me, out of love.  I love him; he love me,

17  too.  That means a lot because he's here.

18    And that's my mom.  That's my mother.  I haven't seen her

19  in 20 years.  I haven't seen her in 20 years.  That's my mom

20  and my daddy.  You know, I haven't seen them in 20 years.  And

21  I knew it would be hard for me to see them because, you know,

22  they done aged.  They done aged, since I've been in here.  But

23  that's my mom and my dad, you know.  They gave me everything

24  when I was a child.  My daddy used to whoop me and then tell me

25  that he did it because he loved me, you know.  And I know he

REDACTED TRANSCRIPT

53

1  was telling the truth.  He did everything for me.  He did

2  everything for me.  He taught me how to be a man, you know.

3  And I ended up, you know, strayed away.  I always tried to find

4  my way back to 'em.  The whole time I was in prison, I didn't

5  want to spend 20 years in prison and then get out and didn't

6  have nothing and say, you know, I've been in prison twenty

7  years, and I didn't do nothing; I didn't earn nothing.  So,

8  that's why I went for my GED.  That's why I went for -- you

9  know, tried to make change.  That's why I was stressing the

10 rehabilitation program, to get more certificates.

11        So that's my mom, Ms. Betty Houston, and that's my dad,

12 Mr. Henry Houston.  Both of them are good parents -- great

13 parents, you know.

14        This is my lovely, beautiful wife, Ms. Tina Houston.

15 She's also in ministry.

16        This is my sister-in-law Ge Dora Foxx.  She's -- she's

17 Dora.  You know, Dora is a very, very -- she has supported me

18 since day one.  We talk a lot.  We minister to each other a

19 lot, you know.  We can relate to each other.  And she's here to

20 support me also.  And I thank her.  I thank all of them.

21        And on the back row is Mr. -- to the left is Mr. Todd.

22 Mr. Todd, he comes to the prison.  He's in prison ministry.  He

23 works over there at the prison.  He comes in every week for

24 Bible study, and he's amazing.  When I say, "He's amazing,"

25 I've been in prison all these years and I've seen -- never seen

REDACTED TRANSCRIPT

54

1    a minister that bring it like they bring it.  It's a difference

2    from tradition and revelation, you know.  They don't come with

3    tradition.  They come with revelation, you know, where they

4    open -- the word actually talks to us when they speak.

5        And then we have Dr. Harland.  Dr. Harland also does the

6    prison ministry.  He comes over to the prison.  And they've

7    both been in prison ministry for some years.  And they're

8    different.  When I say they are different, they are -- when

9    they speak, we all get revelations.  I have never seen

10   ministers come into a prison like that, you know.  They sit --

11   they have actually witnessed the revival going on over there.

12   They've witnessed guys get miracles, you know.  Miracle after

13   miracle.  The pod that I'm on, no pod -- no other pod is

14   getting the miracles, you know.  And I know that the Bible says

15   that anywhere the spirit of the Lord been, there's miracles,

16   signs, and wonders.  There's liberty.  And God is confirming

17   His word on that pod.  Everybody is trying to get there.  All

18   of the other inmates are trying to get there.  Because, you

19   know, God said, "My people are destroyed for a lack of

20   knowledge."  And they bring the knowledge of God to the pod.

21   So, I want to thank them also for being here.

22       **THE COURT:**  Well, thank you for introducing them.  I

23   thought it was important.  There are times often where I have

24   to sentence someone and no one is here in the courtroom on

25   their behalf.  So I appreciate all the folks coming to support

**REDACTED TRANSCRIPT**

55

1  you.

2      There being nothing further, this sentencing is continued

3  until next Wednesday pursuant to Notice.  We are adjourned.

4      (Adjourned:  12:24 p.m.)

5                          CERTIFICATE

6          I, Brenda D. Blackburn, Federal Official Court

7  Reporter, in and for the United States District Court for the

8  Northern District of Mississippi, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that the

10  foregoing 54 pages are a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is in

13  conformance with the regulations of the Judicial Conference of

14  the United States.

15          Witness my hand, this 5th day of January, 2023.

16

17                          /s/BRENDA D. BLACKBURN
                          _____
18                          BRENDA D. BLACKBURN, RPR, CCR NO. 1087
                          FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25